UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Magistrate Case No. '08 MJ 1439 |
| Plaintiff, | |
| | COMPLAINT FOR VIOLATION OF: |
| v. | |
| | Title 8 U.S.C., Sec. 1324 (a)(1)(A)(iii) |
| 1) Blanca BLANCO | Harboring and Concealing (Felony) |
| 2) Ramon Daniel QUINTEROS | |
| 3) Jaime Elias QUINTEROS | |
| Defendant(s) | |

The undersigned complainant, being duly sworn, states:

On or about **May 5, 2008,** within the Southern District of California, defendant **Blanca BLANCO, Ramon Daniel QUINTEROS, and Jaime Elias QUINTEROS**, knowing and in reckless disregard of the fact that certain aliens, namely, **Luis SANCHEZ-Campos, Noemi LOPEZ-Medina, and Jaime Enrique MORENO-Ruiz**, had come to, entered and remained in the United States in violation of law, did conceal, harbor and shield from detection said aliens, and attempt to conceal, harbor and shield from detection said aliens, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

And the complainant further states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

SIGNATURE OF COMPLAINANT
Gilbert R. Ramirez
Senior Patrol Agent

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS **7th** DAY OF **MAY, 2008**

Louisa S. Porter
UNITED STATES MAGISTRATE JUDGE

**CONTINUATION OF COMPLAINT:**
**Blanca BLANCO, Ramon Daniel QUINTEROS, and Jaime Elias QUINTEROS**



## PROBABLE CAUSE STATEMENT

I declare under the penalty of perjury that the following statement is true and correct:

On May 3, 2008, at approximately 1:45 a.m. while performing border patrol duties near Interstate 905 and Palm Avenue in Chula Vista, California, Supervisory Border Patrol Agent C. Liedecke was observing vehicle traffic heading northbound on Interstate 805. This area is approximately two miles directly north of the United States – Mexico International Border and is a direct route north from the San Ysidro, California Port of Entry. Agent Liedecke noticed three vehicles that appeared to be traveling in tandem. All three vehicles were traveling close together and at approximately the same speed. Agent Liedecke noticed these vehicles because the amount of traffic on the Interstate was light, the close proximity between the vehicles, and that all three vehicles would make the same lane changes all at the same time. Agent Liedecke continued to follow these vehicles as they traveled north on Interstate 805 for approximately four miles and then they exited at E Street in Chula Vista, California. Agent Liedecke noticed one distinguishing feature of one of the vehicles, a dodge Dakota pickup truck with Baja California, Mexico plate (AM-71359), that the driver's side brake light was visibly dimmer than the passenger side light. In addition, the Dodge Dakota appeared to "bounce" as it went over bumps in the road.

In Agent's Liedecke's years of experience as a Border Patrol Agent, this could indicate that the vehicle is heavily laden. All three vehicles continued traveling westbound on E Street in Chula Vista, all directly in line behind one another traveling at the same speed for approximately two miles, until they reached the intersection of East Park Street in Chula Vista, California. This street appears to be a small alley way between local businesses and the rear of residences that are located on Ash Street, Chula Vista, California. Some of these residences have gates that allow access to the rear of these residences. All three vehicles came to a stop in this alley and parked behind a local business (AutoZone), directly in front of the rear entrance to at 226 Ash Street. These vehicles appeared to meet a black Ford F-150 that had also arrived at the residence at approximately the same time. Border Patrol Agents A. Cacho and E. Blas assisted in establishing surveillance of the vehicles that were parked outside the rear of this residence.

At approximately 4:00 a.m. Agents Liedecke, Blas, and Cacho returned to the residence on Ash Street in Chula Vista, California. Agents reestablished surveillance of the house and the alley way. Agents noticed several other vehicles pull in behind the residence and park in the same manner as the previous vehicles. One of these individuals got out of his vehicle and peered over the fence that leads to the rear of the house on Ash Street and then makes a phone call. Individuals in the other vehicles exited their respective vehicles and began to converse with each other. At the same time, Agents observed a red Toyota RAV leave the front of the residence with several individuals in the vehicle. The vehicle traveled to a Denny's restaurant located approximately one-half mile west of the residence. The vehicle stayed at the restaurant for a short period of time and returned back to the house. The vehicle then made another trip to the Denny's restaurant and returned again back to the house. Another vehicle, a white Nissan sedan with discolored driver's side and passenger-side doors appeared to travel in the same manner as the Toyota RAV. This Nissan would make several trips around the block, stop at Denny's restaurant and then return to the residence. A Silver Jeep SUV was observed exiting the rear of the residence and driving around the block and parking in the front of the house. This vehicle was also seen driving to the Denny's restaurant for a short period of time and then returning to the residence.

Agents also observed a red Isuzu SUV which was parked outside the front of the residence leave and head towards Van Dyke Avenue in Chula Vista, California. The Isuzu was then observed returning to the residence a short time afterwards. Based upon Agent Liedecke's experience, alien smuggling organizations use residences as drop-off locations to temporarily harbor illegal aliens until other vehicles arrive to transport these people to further their entry into the United States. Also, many organizations will use public facilities to perform "buy-

2



outs" where aliens are then transferred to their sponsors or another smuggling organization which specializes in transporting aliens.

Observations of the initial vehicles made by Agents from the United States – Mexico Border area to the residence traveling in tandem, the numerous vehicles and their driver's behavior of brief departures from the residence on Ash Street and Denny's restaurant, and counter-surveillance measures of driving circles around the residence before parking are consistent with the modus operandi of many smuggling organizations.

At approximately 6:15 a.m., Agents observed several individuals exit the residence on Ash Street and depart in the Toyota RAV4. At the same time, additional people exited the residence and get into the white Nissan sedan. Agents began to follow the RAV4 and the Nissan as it went westbound on E Street towards Interstate 5. Based upon Agents' observations and assumption that these vehicles were attempting to transport illegal aliens further into the United States, Agent Cacho attempted to perform a vehicle stop on the Nissan sedan. As Agent Cacho initiated his Bureau lights, the driver of the Nissan accelerated and proceeded north on Interstate 5 in an attempt to flee. Agent Cacho and Agent Blas continued to follow, with fully functional emergency lights, the Nissan sedan as it proceeded at a high rate of speed eastbound on Highway 54 and southbound on Interstate 805. Due to the endangerment to the public, Agents discontinued the vehicle pursuit and returned to the residence.

During the initial vehicle stop, Agent Liedecke observed the driver of the Nissan frantically trying to make a phone call. Agent Liedecke assumed this could have been an attempt to call the residence and warn the occupants at the house of potential police activity upon the residence. As a result, Agent Liedecke went back to the residence and noticed three females standing outside the back gate on Ash Street. Agent Liedecke approached these individuals, identified himself as a Border Patrol Agent and asked if they reside at this residence. The subjects stated that they did in fact live at the house. Agent Liedecke questioned these individuals as to their immigration status. One subject, later identified as the defendant Crystal Macias, stated that she was a United States citizen. The other subject, later identified as Lilia RENDON-Cortez, stated that she was a citizen of Mexico and did not possess any immigration documents to remain in the United States. The third subject, later identified as Kasandra DOMINGUEZ, was the child of RENDON, in which the mother stated that her child was a United States Citizen.

Agent Liedecke asked the defendant who else is in the residence. The defendant responded that her mother-in-law and her boyfriend are in the house. Agent Liedecke asked if they could go into the house and talk to her mother-in-law. The defendant stated that her mother-in-law wasn't there. Agent Liedecke also advised the defendant that he noticed quite a few individuals coming and leaving the house. The defendant stated that she didn't know anything about that. Agent Liedecke confronted the defendant on her conflicting statements regarding her mother-in-law being in the house and requested if we could go see who's in the house. The defendant stated that she can't get in because the gate is locked. Agent Liedecke stated that he would go around front to knock on the door to see if he could talk to someone and let the defendant in the back. Agent Liedecke approached a Chula Vista Police Department officer that was driving by and asked if he could assist Agent Liedecke with the "knock and talk". Agent Liedecke continued to knock at the front of the residence to no avail. Agent Blas went around to the rear of the residence to continue to talk to the defendant. Agent Blas requested Agent Liedecke if he could come to the rear of the residence. Agent Liedecke went back around to the rear of the residence.

Agent Liedecke then approached RENDON and asked if she lived at the residence. RENDON stated that she lives in the "garage-conversion" structure that is located behind the main residence and with the property bounded by the fence. Agent Liedecke asked if she would allow him to enter her residence for the purpose of seeing if anybody else is in the residence. RENDON agreed to allow Agent Liedecke into the residence. After



a brief search of the "garage-conversion", Agent Liedecke noticed another structure a few feet away from the residence. As Agent Liedecke approached this "storage" structure, he put his hand up to the space next to the door closure area. Agent Liedecke could feel a highly abnormal amount of heat emanating from this space. There was a distinct smell of body-odor which through Agent Liedecke's experience is typical of a large number of individuals being confined in a small space. Agent Liedecke knocked on the outside of the structure, identified himself as a Border Patrol Agent and asked if they would come outside. Approximately thirty individuals came out from the structure. This structure was approximately 8 feet wide by 12 feet long. It appeared to be a pseudo one-bedroom dwelling. The structure did not have a bathroom, running water, or air-conditioning. The structure did contain a television and a bed. There were no windows and did not have any other doors beside the front door. All thirty of these individuals were questioned in regards to their citizenship and their immigration status. Each of these thirty individuals stated that they were from Mexico and did not possess any immigration documents to remain in the United States.

Additional Chula Vista Police Department Officers had arrived at the residence at this point in time and assisted in securing the scene. While Agent Liedecke was attending to the individuals now in custody, a Chula Vista Police officer noticed the rear door of the main residence slightly open. This officer obtained consent from the defendant to enter the house to check for any individuals. The officer announced his presence and entered the house and discovered ten individuals in one of the bedrooms of the house. This bedroom is part of the main house and had mail in the name of Roman Quinteros laying on the dresser in plain view. One additional individual was found hiding under a baby's crib. All eleven of these individuals were escorted outside and were interviewed by Agent Liedecke to determine their citizenship and immigration status. Agent Liedecke questioned each person individually and each responded that they were citizens of Mexico and did not possess any immigration documents to remain in the United States. All these individuals were place under arrest. Agent Liedecke then informed the defendant that she was under arrest for alien smuggling.

All the individuals were transported to the Imperial Beach Border Patrol Station in Imperial Beach, California.

## STATEMENT OF DEFENDANT CRYSTAL MACIAS:

On Saturday, May 3, 2008 Agent Ballesteros took a sworn video statement from the defendant Crystal MACIAS. This statement was witnessed by Agents Blas and Liedecke. The defendant stated that she understood her rights and was willing to answer questions without an attorney present.

The defendant stated that she was a United States citizen, born in San Diego, California. The defendant stated that she lives at 226 Ash Street, Chula Vista, California with her kids, her "mother-in-law", Blanca Blanco, her boyfriend, Jaime Elias Quinteros, and his brother Ramon Quinteros.

The defendant stated the one room dwelling in the rear of the property is used as storage and that she goes in there all the time. The defendant stated that her boyfriend Elias is unemployed and is not involved in smuggling. The defendant stated that morning was the first time that she has seen people in the house besides the people that live there. The defendant stated that everybody in the house was panicking. The defendant stated that she first tried to leave the house with Lilia. The defendant admitting knowing that the people in the house were illegal aliens. The defendant stated that was the reason why she wanted to leave the house. The defendant concluded that by saying that she has no involvement in alien smuggling.

On Saturday, May 3, 2008 Agent Quintero took a supplemental sworn video statement from the defendant Crystal MACIAS. Agent Penta witnessed this sworn statement.



**CONTINUATION OF COMPLAINT:**
**Blanca BLANCO, Ramon Daniel QUINTEROS, and Jaime Elias QUINTEROS**

On Saturday, May 3, 2008, at approximately 10:24 P.M., Agent Penta reminded the defendant that she was still under oath. The defendant stated that she understood this advisement and was coming forth of her own free will. The defendant stated that she wanted to cooperate and share some information with Agents that might be helpful. When asked about her previous statement that she provided to Agents, the defendant stated that she left out some information that she now wanted to provide. Agent Quintero witnessed this event.

The defendant told Agents that she lives at 226 Ash Avenue, Chula Vista, California. The defendant stated that she lives at the residence with her boyfriend, Jaime Elias QUINTEROS (who she refers to as Elias), Elias's brother Ramon QUINTEROS, Ramon's wife Sandra (last name unknown), and Elias's mother Blanca BLANCO. The defendant pays Blanca $500.00 USD per month for rent and has been living at the aforementioned address for approximately three months.

According to the defendant, she has been aware that Sandra's sister, Mari, operates an illegal alien stash house near 58th Street and El Cajon Boulevard. Mari "calls the shots." Mari is in contact with Sandra. Mari tells Sandra how many people are being smuggled into the United States, what time they are to be picked up, and the location. Sandra in turn, directs Ramon and Elias. Ramon and Elias operate both as scout drivers and "load" drivers. Ramon and Elias pick up illegal aliens from the border and bring them to Mari's house. Ramon and Elias are paid $100.00 per smuggled illegal alien. Mari has been operating the "load" house for several years. When asked how she knew about Mari's house, the defendant stated that she had previously brought Blanca there in order to pick up rent money. The defendant stated that up until a couple of weeks ago, the residence near 58th Street and El Cajon Boulevard was the primary location where the illegal aliens were taken after crossing the border. The defendant stated that to her knowledge, 226 Ash Avenue has only been used as a stash house for illegal aliens on two occasions. The first was approximately three weeks ago, when Ramon brought four or five illegal aliens to the Ash Avenue residence. The illegal aliens stayed in a one room dwelling located in the backyard before being brought to their final destination. Blanca takes care of the aliens by bringing them food and water.

At approximately 4:00 A.M., on Saturday, May 3, 2008, the defendant awoke to a commotion in the house. Blanca and Sandra were both awake and seemed to be in a panic. When the defendant inquired as to their distress, Sandra and Blanca said that they believed there were detectives and law enforcement arriving at the house. The defendant stated that she noticed a bunch of people that she believed to be illegal aliens scattered about on the floor inside the house. Blanca and Sandra believed that their arrest for their involvement with alien smuggling was imminent. MACIAS stated that Blanca kept a log of the illegal aliens that they were smuggling into the United States. Believing they were about to be arrested, Blanca told Sandra to tear up the log and throw it in the trash. Sandra tore up the log and threw it away. Ramon, who was at the house as well, left the residence in a gold vehicle and avoided contact with law enforcement officers. The defendant then helped Sandra evade law enforcement officers by driving her and her children to an Aunt's house on Van Dyke, in Chula Vista. The defendant drove back to her residence where she encountered law enforcement officers and was subsequently arrested.

MACIAS stated that she believed the group of illegal aliens discovered at her residence on May 3, 2008, were supposed to have crossed the border a few days prior, but the plans had been changed. When asked if she has ever been involved in any alien smuggling operation, MACIAS admitted that on one occasion, she worked as a scout. MACIAS stated that Mari's brother (name unknown) scouts the U.S. Border Patrol checkpoint near Camp Pendleton.

**CONTINUATION OF COMPLAINT:**
**Blanca BLANCO, Ramon Daniel QUINTEROS, and Jaime Elias QUINTEROS**



When the checkpoint is not operational, Mari's brother calls either Ramon or Elias to advise that it is clear to drive with the illegal aliens through the checkpoint area. MACIAS believes that Ramon and Elias brings the illegal aliens to Los Angeles, California. MACIAS stated that on one occasion, she and Blanca scouted the Border Patrol Checkpoint near Camp Pendleton. When the checkpoint was not operational, MACIAS called

Ramon and told him that "the coast was clear" to bring the illegal aliens through. In return, MACIAS was paid $100.00 USD; fifty of which she gave to Blanca.

MACIAS was presented with a series of photographic line-ups. When presented with photo line-up #1, MACIAS identified photograph number two as her boyfriend, Jaime Elias QUINTEROS (referred to as Elias in her previous statements). Agents then presented photo line-up #2. MACIAS identified photograph number four as Ramon QUINTEROS, Elias's brother. Agents presented photo line-up #3, and MACIAS identified photograph number three as Blanca BLANCO, Elias and Ramon's mother. Agents presented MACIAS with photo line-up #5. MACIAS was unable to identify any of the subjects presented.

**STATEMENT OF DEFENDANT BLANCA BLANCO:**

On May 3, 2008, Border Patrol Agents conducted anti-smuggling surveillance on a residence on the two hundred block of Ash Avenue, Chula Vista, California. This surveillance resulted in the arrest of thirty-nine (39) undocumented aliens from Mexico and a suspect who harbored them at that address. Under oath, the suspect, Crystal Macias implicated defendants **Blanca BLANCO, Ramon Daniel QUINTEROS, and Jaime Elias QUINTEROS** as the residents of the address who where actually harboring aliens at the residence and whom had avoided arrest that day.

On May 5, 2008 at approximately 4:50 P.M. SBPA C. Liedecke and BPA J. Quintero proceeded to the above address on Ash Avenue, Chula Vista, California to conduct a consent interview with the residents of dwelling. Upon knocking at the door a woman answered the door. Agent Liedecke identified himself as a Border Patrol Agent and stated he was conducting an investigation of the harboring of aliens from this residence on the day before. The defendant introduced herself as Blanca BLANCO and invited the agents in. Agents encountered three men in the front room, two of whom identified themselves as defendants **Ramon Daniel QUINTEROS and Jaime Elias QUINTEROS.** Also present was Antonio BLANCO, the husband of BLANCA. The agent received consent to search the residence for evidence of harboring aliens. At approximately 6:35 p.m., Agents D. Penta, C. Bush, and C. Liedecke arrested **Blanca BLANCO, Ramon QUINTEROS, and Jaime QUINTEROS** based upon testimony of smuggled aliens, suspect Crystal MACIAS, and observations made by agents during the early morning smuggling events on May 3, 2008 at the address on Ash Avenue, Chula Vista, California. The defendants were transported to the Chula Vista Border Patrol Station for processing.

The defendant was advised of her rights as per the Miranda Warning. The defendant understood her rights and agreed to be interviewed without representation. BLANCO admitted that she had made arrangements with Mari, a family friend who was going to pay her $20.00 US for every illegal alien taken to her house. BLANCO stated that her only role was to keep the illegal aliens in her property for a short time and that they would later be taken away. BLANCO stated that she did this because she was going through a financial crisis and she really needed the money to pay her bills. Mari told BLANCO that approximately forty illegal aliens were coming and to be ready.

BLANCO admitted that approximately two weeks ago she allowed approximately thirty illegal aliens to stay in her property. BLANCO stated that on that occasion she made the arrangements with Mari who offered to pay



her $500.00 US. BLANCO stated that three days later "El Chino", Mari's brother, came to her house and personally paid her the $500.00 US.

## STATEMENT OF DEFENDANT RAMON DANIEL QUINTEROS:

The defendant was advised of his rights as per the Miranda Warning. The defendant understood his rights and agreed to be interviewed without representation. QUINTEROS informed Agents that he knew approximately sixty illegal aliens were supposed to be coming to the house that day, and arriving in five different vehicles. However, only four of the vehicles actually made it to the residence. QUINTEROS stated that a man who uses the moniker, "Perico" is an illegal alien smuggler that coordinated the transportation of the aliens to his house. QUINTEROS stated that he has worked as a "scout" driver for Perico in the past.

Perico has told QUINTEROS to be ready to make his house available during the days of Wednesday through Sunday. These are the days that they will be smuggling illegal aliens. QUINTEROS stated that the drivers usually get $500.00 US per alien.

At approximately 1:45 A.M., on Saturday, May 3, 2008, Perico called QUINTEROS and advised him that four load vehicles would soon be en route to his residence. When Perico arrived with the load vehicles, QUINTEROS opened his back gate and allowed the illegal aliens and the load drivers to enter the residence. QUINTEROS stated that Perico was nervous and in a panic. Perico believed that he was being followed by law enforcement officers. QUINTEROS and Jaime Elias acted as look-outs and noticed police vehicles nearby. Perico told QUINTEROS to leave the house and find out if he would be followed. QUINTEROS and Jaime Elias left the house in the Jeep Cherokee and drove around the block to see if they would be followed. Shortly thereafter, QUINTEROS and his brother were pulled over by the Chula Vista Police. QUINTEROS and Jaime Elias went back to the house and told Perico that they were indeed followed by law enforcement and were subsequently pulled over. At this point, two men showed up at the residence in two vehicles. Eight of the illegal aliens got into the vehicles and left the residence. Shortly thereafter, one of the drivers called Perico and stated that they were being chased by Agents.

Fearing an imminent arrest by law enforcement, QUINTEROS drove Perico and another load driver to the trolley station in National City. QUINTEROS did not return to his residence that morning. QUINTEROS said that he was supposed to work as a scout on this occasion but was not able to because Agents came to his house and arrested the illegal aliens. QUINTEROS further stated that his mother, Blanca was to get $25.00 US per illegal alien. The illegal aliens were to stay in the small one bedroom structure located in the backyard until their facilitation to Los Angeles, California.

## STATEMENT OF JAIME ELIAS QUINTEROS:

The defendant was advised of his rights as per the Miranda Warning. The defendant understood his rights and agreed to be interviewed without representation.

The defendant stated that his true and correct name is Jaime Elias QUINTEROS. QUINTEROS stated that he is a United States Citizen and that he lives at 226 Ash Avenue in Chula Vista, California with Blanca BLANCO (his mother), Ramon QUINTEROS (his brother), Sandra QUINTEROS (his brother's wife), and Ramon's children.

**CONTINUATION OF COMPLAINT:**
**Blanca BLANCO, Ramon Daniel QUINTEROS, and Jaime Elias QUINTEROS**



QUINTEROS stated that alien smuggling has been going on at the residence for about two weeks. QUINTEROS states that his brother, Ramon, woke him up about 2:00 a.m. and told him to take off. QUINTEROS stated that three vehicles brought the aliens to the house. QUINTEROS stated that he knew that the aliens at the house were illegal. He also said that he assumed that his mother, defendant Blanca BLANCO knew that the individuals at the house were illegal aliens.

QUINTEROS said that that Ramon's wife sister, who is called "Mari", is the individual that calls the "shots." MARI sends her brother to the house. Mari's brother arrived when the illegal aliens arrived at the house and was to transport the illegals north to Los Angeles, California.

QUINTEROS stated that two cars arrived at the house. The drivers came in and started calling names. The drivers then left with about three illegals each. QUINTEROS stated that Mari's brother offered to pay him to transport the illegals north but that he declined.

QUINTEROS admitted to being a "load" driver on a prior occasion where he transported illegal aliens from the house at 226 Ash Avenue to the Los Angeles Area. QUINTEROS stated that on this particular event, he drove a vehicle away from the house at 226 Ash Avenue in an attempt to lead law enforcement officials away so that the smugglers could escape apprehension.

## MATERIAL WITNESS STATEMENTS:

Material witnesses **Luis SANCHEZ-Campos, Noemi LOPEZ-Medina, and Jaime Enrique MORENO-Ruiz** agree in summary that they are citizens and nationals of Mexico illegally present in the United States. They admit to entering the United States illegally. The material witnesses stated that they were to pay $3,500.00 to $5,000.00 (US) to be smuggled into the United States. Material witnesses **Luis SANCHEZ-Campos** and **Jaime Enrique MORENO-Ruiz** were shown a photographic line up and were able to identify defendant #4 **Crystal MACIAS** as the lady they saw outside the house when they were arrested by the Border Patrol Agents.